*In re* DAVONTE L., a Minor, Respondent-Appellant (The People of the State of Illinois, Petitioner-Appellant, v. Tawanda R., Respondent-Appellee).

First District (6th Division)   Nos. 1—97—2432, 1—97—3323 cons.

Opinion filed August 7, 1998.

Patrick T. Murphy and Lee Ann Lowder, both of Office of Public Guardian, of Chicago, for appellants.

Rita A. Fry, Public Defender, of Chicago (R.H.R. Silvertrust, Assistant Public Defender, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

The minor respondent-appellant, Davonte L. (Davonte), through the office of the public guardian, appeals from a circuit court order dismissing the State's petition for the appointment of a guardian with the right to consent to Davonte's adoption. For the following reasons, we find that the decision of the trial court was against the manifest weight of the evidence, and we reverse.

On September 15, 1992, the Department of Children and Family Services (DCFS) filed a petition for adjudication of wardship on behalf of Davonte, alleging that he was neglected because he had been exposed to an injurious environment and was born testing positive for cocaine.

On February 9, 1993, the juvenile court found that Davonte was neglected due to exposure to an injurious environment. On March 23, 1993, Davonte was adjudicated a ward of the court, and DCFS was appointed as Davonte's guardian and Davonte was placed in foster care.

On March 16, 1995, the State filed a supplemental petition for appointment of a guardian with the right to consent to Davonte's adoption. The supplemental petition to terminate parental rights alleged the following grounds of parental unfitness: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to Davonte's welfare (750 ILCS 50/1(D)(b) (West 1994)); (2) desertion of Davonte for more than three months before the commencement of proceedings for the termination of parental rights (750 ILCS 50/1(D)(c) (West 1994)); (3) that the parents were habitual drunkards or addicted to drugs for at least one year immediately prior to the commencement of the unfitness proceeding (750 ILCS 50/1(D)(k) (West 1994)); (4) that the parents failed to make reasonable efforts to correct the conditions that were the basis of Davonte's removal from their custody within 12 months after the adjudication of neglect and/or failed to make reasonable progress toward the return of the child within 12 months after the adjudication of neglect (750 ILCS 50/1(D)(m) (West 1994)); and (5) that the parents evidenced intent to forego parental rights by their failure to visit Davonte or communicate with him or DCFS for a 12-month period (750 ILCS 50/1(D)(n) (West 1994)).

Davonte's father, Kermit L., was defaulted in the case on April 17, 1995.

The hearing on the petition for appointment of a guardian with the right to consent to Davonte's adoption took place from January 2, 1997, to June 10, 1997. At the hearing on the petition, testimony and evidence were presented from various caseworkers from DCFS, child specialists, workers in other private service organizations that were involved with Davonte's case over the past six years, and respondent-appellee, Tawanda R. The following facts were adduced at the hearing.

On October 25, 1990, Tawanda gave birth to her first child, Hakeem. Hakeem tested positive for cocaine. On October 26, 1990, a social worker at the University of Illinois at Chicago (UIC) Hospital where Tawanda gave birth advised Tawanda that DCFS had been notified of Hakeem's prenatal drug exposure. Tawanda admitted that she needed drug treatment. Tawanda was allowed to take Hakeem home upon being discharged from the hospital after Tawanda's mother agreed to provide close supervision and cooperate with the DCFS investigation.

According to a November 21, 1990, DCFS report prepared by William Blackmon, Tawanda admitted using drugs regularly before her pregnancy, but only periodically after she discovered she was pregnant. Tawanda denied that her drug use was a problem. Tawanda's family, however, stated that her drug use was a problem and that Tawanda had spent all of her money on drugs, had lost most of her clothing, and did not care about anyone. Later, Blackmon was also assigned to Davonte's case. Before Davonte was born, Blackmon referred Tawanda to a drug treatment program, but Tawanda did not enroll in one.

Tawanda did not bring Hakeem to scheduled appointments at the UIC Pediatric Clinic on January 9, 1991, January 16, 1991, or February 10, 1991. On February 26, 1991, Tawanda brought Hakeem to the hospital because he had been vomiting. Hakeem was diagnosed with an acute viral syndrome. The emergency room staff advised Tawanda to return to the pediatric clinic in two to three days, but Tawanda again missed scheduled appointments on March 1, 1991, and March 20, 1991. On May 13, 1991, a UIC social worker called the DCFS hotline because Tawanda missed Hakeem's sixth consecutive scheduled appointment. At that time, Hakeem was five months old but had not had any immunizations. On May 30, 1991, a DCFS investigator called the UIC clinic to notify it that Hakeem's grandmother had made a report to the DCFS hotline that Hakeem was not being supervised. The investigator said that Tawanda was "sarcastic and uncooperative with the investigation." On June 4, 1991, the UIC Pediatric Clinic sent Tawanda a letter, asking her to call as soon as possible because

Hakeem needed treatment for anemia. After sending two more letters and rescheduling three missed appointments, the clinic threatened to report Tawanda to DCFS for medically neglecting Hakeem. Tawanda came to the clinic on June 28, 1991.

Tawanda then later violated a protective order by neglecting Hakeem and failing to provide him with adequate supervision. On December 7, 1992, Hakeem was placed in foster care.

Tawanda gave birth to Davonte on July 8, 1992, at Mount Sinai Hospital Medical Center. Toxicology reports showed that Davonte, like Hakeem, tested positive for cocaine. Davonte also tested positive for opiates. Tawanda admitted to the attending physician that she used cocaine during her pregnancy and said that she last used cocaine three weeks before Davonte was born. Tawanda told a hospital social worker that she was reported to DCFS after Hakeem was born and that she attended an outpatient drug rehabilitation program. The social worker explained the DCFS investigative procedure to Tawanda and encouraged her to cooperate.

On September 15, 1992, DCFS filed a petition for adjudication of wardship on behalf of Davonte, alleging that he was neglected because he had been exposed to an injurious environment and was born testing positive for a controlled substance. That same day, DCFS was appointed as temporary custodian of Davonte. DCFS initially placed Davonte with his maternal grandmother. Tawanda had asked that her mother take care of Hakeem. However, DCFS removed Davonte from his grandmother's home due to additional medical neglect. Davonte was placed in a DCFS shelter and then placed in the foster home of Ida Palmer.

On December 16, 1992, Palmer brought Davonte to La Rabida Children's Hospital because he had been suffering from diarrhea, vomiting and dehydration during the six weeks he had been in her care. During that time, Palmer had taken Davonte to a pediatrician several times, but his condition persisted. A Family Care Services case report dated December 18, 1992, noted that Davonte had symptoms of withdrawal and tremors.

From July 1992 to July 1993, Tawanda did not participate in any drug treatment program, nor did she maintain contact with Blackmon. Blackmon tried to contact Tawanda at least once a month, visiting her house, leaving messages under her door, and talking to her mother. He also had several discussions with Tawanda about her drug problem, and she agreed to seek treatment on several occasions but failed to follow through.

The next time Blackmon saw Tawanda was at Haymarket House in November 1995, where he gave a speech to the women in treatment about DCFS. Blackmon recognized Tawanda in the audience.

During December 1992, Tawanda was not regularly visiting Hakeem or Davonte. Tawanda also was not providing money and food for Hakeem from her public aid check, as she had promised her mother she would do. Tawanda did not return Blackmon's messages, and her whereabouts were unknown.

On February 9, 1993, the juvenile court found that Davonte was neglected due to lack of care, exposure to an injurious environment, and due to the fact that he was born exposed to drugs. At a dispositional hearing held on March 23, 1993, Davonte was adjudicated a ward of the juvenile court, and DCFS was appointed as Davonte's guardian. The court found that Tawanda was unwilling or unable to care for Davonte.

Tawanda did not attend the May 1993 administrative case review. Her progress from December 1992 to May 1993 was rated unsatisfactory.

Teresa Craufel, a social worker from Family Care Services, a foster care agency with which DCFS contracted to provide care for Davonte and Tawanda, was assigned to Davonte's case from December 1992 to December 1993. Tawanda did not contact Craufel from January to October 1993. Craufel did not know where Tawanda was living, so she attempted to contact her through her grandmother, Eva Sturdivant, in September 1993, when she gave her a card and phone number to give to Tawanda.

In mid-November 1993, Tawanda called Craufel and asked if she could visit Davonte before entering a drug rehabilitation program. Craufel testified that Tawanda seemed "cohesive and put together" and that she did not think Tawanda was on drugs or alcohol. Craufel told Tawanda how Davonte was doing and explained the process for obtaining visitation and regaining custody. Tawanda asked repeatedly to see Davonte that day or the following day. Craufel told Tawanda that she would call her at her mother's house as soon as she scheduled a visit. Ten days later, Craufel called Tawanda's mother and told her Tawanda had scheduled a visit with Davonte. However, Tawanda's mother told Craufel that she had not seen Tawanda in a week. Tawanda did not go to the scheduled visit, and she did not contact Craufel again.

On November 18, 1993, Tawanda called Vanessa Muse, her DCFS caseworker at that time, and asked about Davonte. Tawanda told Muse that she talked frequently with Hakeem. Muse made an appointment for Tawanda to come to the office so she could enroll her in a drug treatment program. However, Tawanda did not go to this scheduled appointment and made no further contact with Muse. On March 8, 1994, Muse reported to the court that she had not seen

Tawanda or Kermit, Davonte's father, for the past three months and did not know where they were living.

On March 9, 1994, the juvenile court heard a progress report. Bridget Joyce, a Family Care Services worker who was assigned to the case on February 9, 1994, reported to the court that Tawanda had made no effort to contact Family Care and her progress in regaining custody of Davonte was unsatisfactory. The court scheduled Davonte's case for permanency planning review on March 9, 1995, but the review was rescheduled to June 19, 1995.

On March 25, 1994, Muse spoke with Tawanda at Haymarket House, where Tawanda had enrolled in a drug treatment program and was undergoing a five-day in-take assessment. During her initial assessment on March 28, 1994, Tawanda reported that she had been incarcerated for six days for child neglect. Tawanda stated that she used no more than $50 worth of crack cocaine daily. Tawanda stated the last time she used drugs was March 18, 1994. She stated that the longest time she was able to stay sober was two months, around August 1991. Tawanda was diagnosed as suffering from cocaine and alcohol dependence, and cocaine, alcohol, and mixed drug abuse. Haymarket House also took a substance use history and psychosocial assessment of Tawanda on March 30, 1994. Tawanda reported that she smoked $100 worth of rock (crack) cocaine daily. Haymarket House records also indicate that Tawanda stated she had stolen, engaged in prostitution, lied, and manipulated to support her drug habit. The same day, Tawanda was sent for a physical examination, but she broke Haymarket House's rules when she left the program with some other patients to go buy food at a store. According to Haymarket House rules, patients could only leave when supervised by staff members. Tawanda was discharged and given phone numbers to other treatment facilities. Tawanda had completed only three weeks of the program.

While Tawanda was enrolled in the program, she did not request any visits with her children. After her discharge, Tawanda relapsed to using drugs.

On April 25, 1994, Muse prepared a social investigation report after interviewing Tawanda. Tawanda had revealed that her stepfather had molested her for about a year and that her mother knew of the abuse but did nothing about it. Tawanda's uncles tried to force her stepfather to leave. Then, Tawanda's stepfather was found stabbed in the hallway of the building they lived in. Tawanda met Kermit on the streets in 1988, and they lived together for six months until Kermit was arrested. Tawanda was six months pregnant with Hakeem at the time. Kermit was released from prison a year and a half later, and they resumed their relationship. Two years later, Tawanda became

pregnant with Davonte. Kermit's arrest history dated back to 1976 and included a conviction for manslaughter, for which he served three years, and a conviction for assault, for which he served eight months. Kermit also had convictions for selling controlled substances and stealing property.

In a DCFS report dated May 5, 1994, Tawanda's progress was rated as unsatisfactory because she had not cooperated with DCFS, she had enrolled in but did not complete a drug treatment program, and she had not visited Davonte in the previous year. However, Tawanda had visited Hakeem.

Tawanda visited with Davonte on May 18, 1994. Muse took Davonte and Hakeem to visit Tawanda in a room Tawanda was renting from a friend. Tawanda had not seen Davonte since he was a few months old. Tawanda then moved from this address without informing Muse of her whereabouts. Davonte's case at DCFS was transferred from Vanessa Muse to Kristin Boelcke.

From May to November 1994, Tawanda's progress was rated unsatisfactory by DCFS because she had not been willing to participate in a treatment program for her drug abuse. During this time period, Tawanda visited Davonte twice. Boelcke noted in a May 3, 1994, report that "[v]isits were sporadic—mother was often not home when workers brought the children" to her apartment for visits.

In November 1994, Boelcke took Davonte's case to the adoption screening committee, so that an assistant State's Attorney could determine whether to file a petition to terminate parental rights. Boelcke had searched for both Tawanda and Kermit to no avail. She sent two letters to Tawanda's last known address, but both letters were returned. Boelcke spoke with Tawanda's maternal grandmother, who had custody of Hakeem, Eva Sturdivant, but Sturdivant did not know Tawanda's whereabouts. Boelcke obtained an address from Tawanda's cousin, Sharon, and sent a letter, but Tawanda did not respond. Boelcke checked with the Illinois Department of Corrections, Cook County jail, the Chicago Post Office, the agency providing foster care to Hakeem, and the public aid roles for Tawanda's address. Boelcke testified that she did not attempt to contact Haymarket House or other treatment centers, because Tawanda had previously refused to enter any treatment programs.

On March 16, 1995, the State filed a supplemental petition for the appointment of a guardian with authority to consent to Davonte's adoption.

On June 6, 1995, Boelcke, Davonte's DCFS caseworker, appeared in court for permanency planning review, but Tawanda failed to appear. Tawanda was found in default, based upon service by publica-

tion, and Davonte's case was scheduled for a hearing on the petition to terminate parental rights.

The hearing was later continued for status to September 27, 1995. On that date, Tawanda appeared in court on the petition, and the court vacated the default order that had been entered against her. The case was continued for a status report. That same day, Tawanda called Family Care Services to say that she was interested in regaining custody of Davonte. She stated that she was appealing the court's decision and was assigned a public defender. She stated that she was attending an out-patient treatment clinic and had been clean for 18 days. She also stated that she believed that she had no chance to get Hakeem and Davonte back and that was why she "let her problem get so out of hand." She further stated that she had not seen Davonte in over a year and that she was very anxious to see him. She said that if she could not get Davonte back, she wanted her sister, Patricia R., to adopt him. Tawanda said that she was staying with her grandmother and left the address but not the telephone number. She said she would keep in touch with Family Care Services and said she would do anything asked of her to get her children back. The social worker at Family Care Services returned Tawanda's call on October 2, 1995, in order to set up a visit, and left her a message because she was not home.

On November 20, 1995, Tawanda began drug treatment at Haymarket House. She informed the staff that she had used cocaine for 7 years and alcohol for 10 years. Tawanda immediately developed a pattern of being late to treatment due to oversleeping and also having unexcused absences. Also, on December 29, 1995, and on January 4, 1996, Tawanda disrupted her group meetings.

Karen Agranoff, a foster care worker from Family Care Services who was assigned to Davonte's case from November 1995 to May 1996, testified that she first had contact with Tawanda on November 21, 1995. Tawanda called Agranoff and stated that she was working to get her life back together and that she was employed and wanted to regain custody of her children. Agranoff first met Tawanda in person in early December 1995 at the Family Care offices. Tawanda did not appear to be using drugs.

On December 20, 1995, Tawanda visited with Davonte, and Agranoff observed the visit. Tawanda brought Davonte several Christmas gifts. Davonte commented that he wanted to give several of the gifts to his mother, referring to his foster mother, Ida Palmer.

In January 1996, Tawanda's counselor at Haymarket House noted some progress, when Tawanda reported that she had "deep struggles" about using drugs and that she was worried about a pregnancy test.

Also, Tawanda spoke of the sexual abuse she suffered in early childhood. By the end of January 1996, her counselor was considering referring Tawanda to outside counseling to deal with these physical and sexual abuse issues. Tawanda was becoming somewhat more engaged in treatment and her level of denial was decreasing.

On February 6, 1996, Agranoff met with Tawanda and her therapist, Diane Flynn, at Haymarket House. Agranoff explained that a termination petition had been filed. Tawanda told Agranoff that she wanted to get her children back. Agranoff and Flynn explained that this would be a very long process, possibly several years. Tawanda said she understood and wanted to cooperate.

However, Tawanda had an altercation with a female staff member at Haymarket House on February 20, 1996, during which she made threats. Tawanda had been dating the staff member's ex-boyfriend, Craig, whom she later married. The Haymarket supervisory staff met on February 22, 1996, to discuss the incident and decided to discharge Tawanda for outpatient treatment and following up with DCFS on obtaining additional outside counseling for Tawanda regarding her past sexual and physical abuse and for parenting skills. On February 23, 1996, Tawanda was discharged from Haymarket House to another outpatient treatment center on the west side of Chicago. Haymarket House records indicated that Tawanda had a "psychiatric/emotional/behavioral condition" that was "interfering with addiction treatment and needs treatment in another setting." At the time of her discharge, Tawanda had recently begun working, and all of her drug screening tests were negative.

During this time, Tawanda visited Davonte. Agranoff, Davonte's foster care worker from Family Care Services, had scheduled monthly visits for Tawanda with Davonte and Hakeem from December 1995 to April 1996. Agranoff supervised all but two of the visits. During the six months Agranoff was on the case, Tawanda was cooperative. However, Agranoff testified that as of the last date she was on the case, May 19, 1996, she did not believe Davonte was ready to return home, because Tawanda's progress was not sufficient to regain custody.

Tawanda was consistent with visitation until April 1996. After that date, she did not visit Davonte.

On August 25, 1996, Larry M. Small, Psy. D., a clinical psychologist who specializes in forensics and child custody, conducted a bonding and attachment assessment between Tawanda and Davonte. Dr. Small noted in his report that Tawanda arrived late for the appointment and brought a snack for herself, but not Davonte. Davonte at first did not recognize Tawanda. When asked who she was, Davonte replied, "Nobody." Tawanda showed little regard for Davonte's

emotional state and the fact that Davonte might be confused or upset by being told that she was his "mommy." Davonte was happy and affectionate, although he appeared thin and fragile. When Dr. Small asked Tawanda about her visitation schedule with Davonte, Tawanda said that she had been seeing both Hakeem and Davonte at her grandmother's home, but had last seen them two months before the assessment. Dr. Small did not recommend that Tawanda have unsupervised visitation with Davonte until she maintained regular visitation with him.

The next date Tawanda visited Davonte was on October 21, 1996. Pamela Dahlman, Davonte's caseworker at Family Care since September 1996, noted that Tawanda had called in early September 1996, saying that she wanted her children back and would do whatever was necessary and that she hadn't been visiting for a few months because she did not know whom to contact. On November 4, 1996, Dahlman advised Tawanda's attorney that she was recommending unsupervised visitation between Tawanda and Davonte because she had received documentation from Haymarket House that Tawanda had a sponsor, attended Narcotics Anonymous group meetings weekly, as well as a support group, and that she did community work.

However, on November 13, 1996, Dahlman also informed Tawanda's attorney that she wanted to take the motion for unsupervised visitation very slowly, due to Dr. Small's evaluations, as well as her own, of Tawanda and her boyfriend, Craig. Craig was the leader of a support group, and he and Tawanda spoke with their sponsors every day and saw them three times a week at meetings. Craig admitted that he had engaged in domestic violence in the past with his ex-wife. However, he blamed his addiction to drugs for this domestic abuse and stated that it has not been a problem in his marriage to Tawanda.

In November or December 1996, Craig and Tawanda visited Davonte. Dahlman supervised this visitation. Dahlman also observed two visits between Davonte and Tawanda at Family Care during 1996. During those visits, Tawanda did not say anything inappropriate to Davonte, nor did she correct him when he called his foster mother "Mommy." Tawanda visited Hakeem once or twice in December 1996 and twice in January 1997.

On December 5, 1996, Tawanda's motion for unsupervised visitation was denied, and the trial on the petition to terminate her parental rights and appoint a guardian with authority to consent to Davonte's adoption was set for January 21, 1997.

Prior to the hearing on the petition to terminate parental rights, Dr. Small conducted psychological evaluations of both Tawanda and Craig. Dr. Small conducted a psychological evaluation of Tawanda in late December 1996. He found that Tawanda was not suffering from

any psychiatric illnesses and that her substance abuse and depression were in remission, as she had not used drugs for at least six months.

Tawanda's personal history revealed that Tawanda was raised primarily by her grandmother, because her mother was a drug addict and used cocaine, PCP and alcohol. Tawanda's mother was 13 when Tawanda was born. Her father was found shot in the head in an abandoned building when she was eight years old. Her stepfather sexually abused her from the ages of 10 to 14, but her mother did nothing about the abuse. Her stepfather was later found dead, stabbed 22 times. Tawanda graduated from high school at the age of 16 and received a scholarship to Northern Illinois University. However, she left the university in her second year due to financial difficulties. Tawanda's aunt introduced her to cocaine when she was 20 years old. Tawanda described her relationship with Kermit to Dr. Small as "all drugs. Nothing serious; nothing I want to talk about." Tawanda stated that Kermit, and the other men she dated before Craig, all used drugs and physically abused her.

Tawanda told Dr. Small that she used cocaine when she was pregnant with Davonte, but not with Hakeem. She blamed her mother, rather than herself, for the loss of her children. She stated that her mother had a drug problem. Tawanda insisted that she had taken care of her children by paying her mother to make sure they had milk, diapers and clothes.

When asked how her children came to be placed in foster care, Tawanda claimed that one day she had a toothache and took two 800-milligram capsules of Ibuprofen. Hakeem woke up before she did and began pounding on the window. People on the street called the fire department, and the authorities came and took custody of Hakeem and Davonte.

Tawanda said she visited Davonte consistently until April 1996, when she started working full-time and began to see Davonte only once a month. During her visits with Davonte, Davonte called Ida Palmer his mother and called Tawanda "mama Tawanda." Tawanda did not attempt to make Davonte call her his mother. Dr. Small believed Tawanda was capable of raising her children and did not recommend that her parental rights be terminated, although her test results reflected a need for counseling or psychotherapy. Dr. Small recommended that Tawanda participate in weekly individual psychotherapy to address her new sobriety and her chaotic family background.

Dr. Small did not find that emotional distress was impacting Tawanda's parenting skills, but he was concerned that Tawanda never really talked about the sex abuse and that it "took her a while to hit bottom with her substance abuse." In addition, he was concerned that

Tawanda had not been in contact with her caseworker. Dr. Small's opinion about Tawanda's ability to parent was based in part on the bonding and attachment assessment he had conducted between Tawanda and Davonte on August 25, 1996. Dr. Small recommended that Tawanda and Craig receive marital counseling and that Tawanda receive individual therapy.

On January 7, 1997, Dahlman conducted an assessment to determine whether the home of Tawanda and her boyfriend Craig would be an appropriate environment for Davonte. Dahlman described the apartment as clean, with plenty of food, and that Craig and Tawanda appeared to have a stable home and a good way of dealing with their problems. Tawanda had told Dahlman that she and Craig deal with their differences by yelling, discussing, or arguing.

The hearing on the petition was set for January 21, 1997, but was continued to February 28, 1997, when it was commenced and continued various times until completion on June 10, 1997.

At the hearing, Dahlman testified that she had not seen any lapses in Tawanda's progress since September 1996. However, on cross-examination by the State, Dahlman admitted that as of January 1997, Tawanda had not entered counseling to address the sexual and physical abuse she suffered as a child. Dahlman could not recall whether Tawanda began counseling eight days before the trial started, but he admitted she could have called the assistant State's Attorney on January 13, 1997, and advised her that Tawanda had started counseling the night before. Also, Craig and Tawanda did not follow through on Dahlman's and Dr. Small's recommendation that they attend marriage counseling.

At the hearing, Tawanda testified that she continued to use cocaine when she was pregnant with Davonte, even after she knew she was pregnant. Tawanda claimed that she made unsuccessful efforts to find out where the children were living after her children were removed from her mother's custody. Tawanda testified that she tried to contact the DCFS caseworker, Blackmon, many times but she could not remember the specific dates she did so. Tawanda claimed that she had tried enrolling in the drug treatment program at Haymarket House at that time, but that she could not get in because there was a waiting list. Tawanda further testified that after her discharge from Haymarket House in 1994, she called the St. Martin de Porres drug treatment program (St. Martin de Porres) and enrolled there. However, she left after two months because she felt the program was too strict.

Tawanda testified that she stopped using drugs in September 1995. She enrolled at St. Martin de Porres and began attending Narcotics Anonymous (NA) meetings three times a week. Tawanda testified that

she has been going to the meetings consistently for two years and will not stop attending the meetings. She also stated that her husband, Craig, was also a member of NA. Tawanda felt she had progressed tremendously. At the time of the hearing, she had an apartment, a husband, and a job. Tawanda testified that her most important emotional need was to be with Davonte. She stated that she completed one parenting class at Haymarket House and was willing to attend additional parenting skills classes to regain custody of her children. Tawanda admitted that she had received many letters from various caseworkers, but denied receiving a letter notifying her that Davonte's case was proceeding to a termination hearing. She claimed that she did not learn of the termination proceeding until she came to court.

On June 11, 1997, the trial court found that Davonte's mother, Tawanda, was not unfit and dismissed the State's petition for appointment of a guardian with the right to consent to Davonte's adoption. The court based its finding on the fact that Tawanda had been sober for almost two years prior to the hearing. The court stated the following in making its ruling:

"Both the State—well, the State, the Public Defender and the GAL all had some very good points. The sad fact for the State's case and the good fact for the mother's case is this is a bureaucracy, and we have had too many years of paperwork.

But I can say that almost two years of being clean wasn't an 11th hour flurry of activity. Two years isn't an 11th hour flurry of activity, but we have to remember these are people and not just paperwork or not just winning a case.

The point is the evidence is not clear and convincing that the mother now is unfit, nor I don't believe she's been unfit since at least September of 1995.

And the fact that it's taken this long to come to court is maybe unfortunate, but it worked for you because you did what you were supposed to. Not saying you did everything because I'm convinced you absolutely need that marriage counseling and your husband needs some domestic violence counseling, but on the whole, it takes a lot to break free from drugs. And I know that the drugs were stopping you from doing a lot of things that you should have been doing, but you have done a great job so far and you need to continue.

So I'm not finding the mother unfit."

The court then continued the matter for a permanency planning hearing for Tawanda and a best interest hearing in regard to the father, Kermit.

On June 30, 1997, the office of the public guardian filed a notice of appeal on behalf of Davonte. On July 2, 1997, the State also filed a notice of appeal.

On appeal, the office of the public guardian, on behalf of Davonte, and the State argue that the juvenile court's finding that Tawanda was a fit parent and maintained a reasonable degree of interest and responsibility for Davonte, that she did not desert him, and that she did not evidence her intent to forego parental rights was against the manifest weight of the evidence. They argue that Tawanda's recent sobriety does not justify a finding of fitness where she had neglected Davonte for several years. We agree and reverse the trial court's ruling.

The supplemental petition to terminate parental rights and appoint a guardian with authority to consent to Davonte's adoption alleged that Davonte's parents were unfit based on the following grounds: (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare, in violation of section 1(D)(b) of the Adoption Act (the Act) (750 ILCS 50/1(D)(b) (West 1992)) and section 2—29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2—29 (West 1992)); (2) deserting Davonte for more than three months next preceding the commencement of these proceedings for termination of parental rights, in violation of section 1(D)(c) of the Act (750 ILCS 50/1(D)(c) (West 1992)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 1992)); (3) having been habitual drunkards or addicted to drugs for at least one year immediately prior to the commencement of the unfitness proceeding in violation of section 1(D)(k) of the Act (750 ILCS 50/1(D)(k) (West 1992)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 1992)); (4) having failed to make reasonable efforts to correct the conditions that were the basis for the removal of Davonte within 12 months after the adjudication of neglect, in violation of section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 1992)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 1992)); and/or having failed to make reasonable progress toward the return of Davonte within 12 months after the adjudication of neglect, in violation of section 1(D)(m) of the Act (750 ILCS 50/1(D)(m) (West 1992)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 1992)); and (5) having evidenced the intent to forego parental rights as manifested by failure for a period of 12 months to (i) visit Davonte, (ii) communicate with Davonte or the agency, and/or (iii) maintain contact with or plan for the future of Davonte, although physically able to do so, in violation of section 1(D)(n) of the Act (750 ILCS 50/1(D)(n) (West 1992)) and section 2—29 of the Juvenile Court Act (705 ILCS 405/2—29 (West 1992)).

Contrary to the trial court's determination, the record establishes that Tawanda was an unfit parent where she failed to maintain a rea-

sonable degree of interest, concern, or responsibility as to Davonte's welfare, failed to make reasonable progress toward the return of Davonte within 12 months after the adjudication of neglect and was addicted to drugs for at least one year preceding the commencement of the unfitness proceeding. 750 ILCS 50/1(D)(b), (D)(m), (D)(k) (West 1994). Given our resolution of the issues on appeal, we need not consider other possible grounds of unfitness.

■ A finding of parental unfitness must be supported by clear and convincing evidence. *In re A.J.*, 269 Ill. App. 3d 824, 828, 646 N.E.2d 1239 (1994). A reviewing court will not reverse the trial court's finding of parental unfitness unless it is against the manifest weight of the evidence, meaning that the opposite result must be clearly evident from a review of the record. *A.J.*, 269 Ill. App. 3d at 828.

■ Our supreme court has held that, in cases such as the present one, under the Illinois Adoption Act (Act) trial courts must undertake a two-step process in ruling on adoption petitions. *In re Adoption of Syck*, 138 Ill. 2d 255, 276, 562 N.E.2d 174 (1990). In a bifurcated trial, the court must first rule on whether the parent is fit. *Syck*, 138 Ill. 2d at 276. A parent's fitness is determined based upon his or her actions within the first 12 months after an adjudication of neglect. 750 ILCS 50/1(D)(m) (West 1994).

If the petitioner proves that one or more of the grounds for unfitness under the Act exist by clear and convincing evidence, the court then conducts the second phase of the bifurcated proceeding, in which it must determine whether termination of parental rights and allowance of an adoption petition would be in the child's "best interests." *Syck*, 138 Ill. 2d at 277. Once a parent has been found unfit by clear and convincing evidence, the decision to terminate an individual's parental rights rests within the sound discretion of the trial judge. *In re V.O.*, 284 Ill. App. 3d 686, 691, 673 N.E.2d 439 (1996).

Here, the court held only a fitness hearing and did not proceed to the second phase, as the trial court did not find Tawanda unfit.

■ Section 1(D)(m) of the Act provides that a parent may be found unfit for failure "to make reasonable progress toward the return of the child to the parent within 12 months after an adjudication of neglected minor." 750 ILCS 50/1(D)(m) (West 1994). Following the removal of a child from the home, the parents must make reasonable efforts to correct the conditions that caused the child to be removed from the home. *In re A.P.*, 277 Ill. App. 3d 592, 598 (1996). At a minimum, parents must make "reasonable progress" toward the return of the child *within 12 months after an adjudication of neglect. A.P.*, 277 Ill. App. 3d at 598; *In re M.C.*, 201 Ill. App. 3d 792, 798, 559 N.E.2d 236 (1990). The question of what is "reasonable progress" is an objec-

tive one. *A.P.*, 277 Ill. App. 3d at 598; *M.C.*, 201 Ill. App. 3d at 798. The law does not afford a parent an unlimited period of time to make reasonable progress toward regaining custody of the children. *In re D.J.*, 262 Ill. App. 3d 584, 591 (1994).

▮▮ The trial court below based its finding that Tawanda was not unfit on the fact that she had remained sober for the two years preceding the hearing. However, this time frame is irrelevant in determining a parent's fitness. A parent's fitness is determined based upon his or her actions in the first 12 months after the adjudication of neglect; here, that was about four months after the child's birth. Davonte was adjudicated neglected on February 9, 1993. Thus, the relevant time period which the court should have considered in making its determination was the 12-month period commencing on February 9, 1993, through February of 1994.

During this time, the mother clearly was an addict and showed almost no interest in Davonte. Tawanda dropped out of drug treatment twice, in December 1992 and March 1994. Both times, she relapsed to drug use. Tawanda spent $100 per day on drugs, lost most of her clothes, and relocated several times. While Tawanda stopped using drugs in September 1995, this was more than 2½ years after the adjudication of neglect.

She enrolled at Haymarket House again in November 20, 1995, but was discharged from the program in February 1996 due to an altercation with a staff member. She was transferred to another outpatient center. After that, Tawanda slowly progressed. She enrolled at St. Martin de Porres and began attending Narcotics Anonymous meetings three times a week. By November 1996, Tawanda had a sponsor, attended Narcotics Anonymous group meetings weekly, as well as a support group, and did community work. This was four years after Davonte was placed in foster care.

Tawanda first showed interest in regaining custody of Davonte in September 1995, when she placed a call to Family Care Services and appeared in court for the first time. This was 3 years after Davonte was placed in foster care, 2½ years after he was adjudicated neglected, and 6 months after the petition to terminate her parental rights was filed. Tawanda claimed that she did not make any earlier efforts to regain custody because she thought there was no way she could regain custody. Tawanda said she made a few calls to inquire about Davonte but then relocated several times without telling anyone her whereabouts and did not follow through on visitation. While Davonte was in foster care for the first six months, Tawanda visited him only once. She visited Davonte twice between May and September of 1994, but the other times Davonte was brought over for visitation, Tawanda was

not home. From September 1994 to September 1995, Tawanda did not visit Davonte at all and made no contact with DCFS or Family Care Services. The termination petition was filed in March 1995, but Tawanda still failed to visit Davonte. Davonte's caseworker at Family Care Services scheduled monthly visits between Tawanda and Davonte from December 1995 to April 1996. This was the only time period Tawanda consistently visited Davonte. By December 20, 1995, Tawanda had visited Davonte only four times since he was placed in foster care. Davonte was 3½ years old at that point. After April 1996, Tawanda again stopped visiting Davonte. The next time Tawanda visited Davonte was in October 1996. After this, both Tawanda and her boyfriend, Craig, visited Davonte once and submitted to psychological evaluations in Tawanda's effort to regain custody.

The trial court found that Tawanda's progress was not "an 11th hour flurry of activity" and lauded her for overcoming her drug addiction in finding that she was fit. The trial court noted that it was fortunate for Tawanda that the case took years to be heard because this allowed her time to make progress. In its ruling, the trial court implied that Tawanda at one time was unfit but, at the time of the hearing, was not then unfit. However, the trial court erred in focusing on Tawanda's recent improvement, rather than the time period set out by the Illinois Adoption Act. Allowing a parent to circumvent his or her own unfitness because of a bureaucratic backlog and delay in bringing the case to trial should not be countenanced. As this court stated in *In re Adoption of D.A.*, 222 Ill. App. 3d 73, 583 N.E.2d 612 (1991):

> "In issuing his ruling, the trial judge stated that grounds for unfitness probably existed at one point but the situation had changed because of [the father's] recent attempts to enforce his visitation rights. In our view, this logic is unsound and could lead to undesirable consequences. The trial court's approach could permit parents who have been severely abusing or neglecting their children for lengthy periods of time to avoid a finding of unfitness by claiming the long-term pattern of abuse or neglect had recently ceased." *D.A.*, 222 Ill. App. 3d at 79.

This court thus held that, in cases involving lengthy periods of objectionable conduct by a natural parent, a recent departure from that conduct does not eliminate the existence of grounds for a determination that the parent is unfit. *D.A.*, 222 Ill. App. 3d at 79-80. Rather, it is merely a factor to be considered during the second phase of the bifurcated trial in determining whether terminating the parent's rights would be in the best interests of the child. *D.A.*, 222 Ill. App. 3d at 80. At this "best interest" hearing, the trial court may consider all

of the prior actions of the unfit parent. It is here that the trial court may focus on what the unfit parent has done recently to prove his or her parental rights should not be terminated.

However, we note that other districts have held that a parent's fitness may be determined based on the entire period after the adjudication and before the filing of a petition to terminate parental rights, beyond the 12-month period prescribed by the Act.

The Third District Appellate Court in *In re R.S.*, 174 Ill. App. 3d 132, 528 N.E.2d 25 (1988), held that courts may look to the entire post-adjudication of neglect period, and not merely a 12-month period, in determining parental fitness. The court in *R.S.* stated that the statutory language of the Act was capable of two interpretations: (1) that a court's determination of unfitness must be based on parenting efforts or progress during the period beginning with the adjudication and ending 12 months thereafter; or (2) that a court may determine unfitness based on a parent's efforts or progress during the entire period between the adjudication and the filing of the petition to terminate parental rights. *R.S.*, 174 Ill. App. 3d at 133. The Third District Appellate Court adopted the latter interpretation, stating that subsection (m) "evidences both the legislature's recognition of the problem of children removed from their parents but ineligible for adoption and the legislature's intent to better protect the interest of such children." *R.S.*, 174 Ill. App. 3d at 133. The court held that "it is clearly in the best interest of the child to consider the parent's conduct during the entire post-adjudication period." *R.S.*, 174 Ill. App. 3d at 133-34. Part of the court's rationale in reaching its holding was the legislative history in the 1977 amendment to the Act, which shortened subsection (m)'s period from 24 months to 12 months (Pub. Act 80—558, eff. October 1, 1977). *R.S.*, 174 Ill. App. 3d at 134. The court stated that "the legislature must have intended to shorten the removed child's period of uncertainty" "by lessening the time which must pass following the child's removal, before his parent could be found unfit." *R.S.*, 174 Ill. App. 3d at 134. The court, however, reasoned that the shortened time period merely reflects the "rehabilitation period" of a parent during which time unfitness may not be found and "does not terminate the period from which evidence may be considered." *R.S.*, 174 Ill. App. 3d at 134.

Courts in other districts then followed the holding in *R.S.* See, *e.g.*, *In re C.R.*, 221 Ill. App. 3d 373, 381, 581 N.E.2d 1202 (4th Dist. 1991) (the time frame in which a parent must make reasonable progress is not limited to 12 months after adjudication of neglect; rather, a court may consider the parent's conduct during the entire post-adjudication period); *In re A.T.*, 197 Ill. App. 3d 821, 832, 555 N.E.2d

402 (4th Dist. 1990) (the 12-month period is a "limiting provision," which guarantees alleged unfit parents a minimum of 12 months to make reasonable progress between adjudication and a hearing on termination of parental rights); *In re J.P.*, 261 Ill. App. 3d 165, 175, 633 N.E.2d 27 (4th Dist. 1994) ("the court should consider progress made during the entire post-adjudication period and not simply during the 12 months immediately following the adjudication"); *In re E.S.*, 246 Ill. App. 3d 330, 338, 615 N.E.2d 1346 (4th Dist. 1993) (the time frame in which a parent has to make reasonable progress toward a reunification plan is not limited to 12 months; rather, the court may consider the parent's conduct during the entire post-adjudication period); *In re S.J.*, 233 Ill. App. 3d 88, 118, 598 N.E.2d 456 (2nd Dist. 1992) ("[a]lthough the statute could be interpreted to give a parent *only* 12 months in which to make 'reasonable progress,' the weight of recent authority is that 12 months is the minimum period in which a parent has to make reasonable progress; therefore, in evaluating whether a parent has made reasonable progress, the trial court should consider the parent's conduct during the entire period after the neglect adjudication").

■ However, it is error for circuit courts to consider a parent's efforts to make reasonable progress toward the return of his or her children outside of the 12-month period prescribed by the Act. The legislative history of the Act evidences an intent to shorten the period of time from which evidence regarding a parent's progress may be considered, not to lengthen it. Any uncertainty as to the time limitations under the Act has been addressed by the Illinois legislature. The Act itself provides that "[t]he best interests and welfare of the person to be adopted shall be of paramount consideration in the construction and interpretation of this Act." 750 ILCS 50/20a (West 1992). Section 20a of the Act was amended in 1994 to further provide the following:

> "It is in the best interests of persons to be adopted that this Act be construed and interpreted so as not to result in extending time limits beyond those set forth herein." 750 ILCS 50/20a (West 1994) (amended by Pub. Act 88—550, § 975, eff. July 3, 1994).

Thus, courts are restricted to allowing evidence only from the 12-month period following an adjudication of neglect in determining parental fitness. Thereafter, in the second stage of the bifurcated proceeding, where the court rules on whether to terminate parental rights, courts may then look to the parent's conduct during the entire period between the adjudication of neglect and ruling on a petition to terminate parental rights. See *Syck*, 138 Ill. 2d at 277.

Here, Tawanda's recent sobriety and improvement in her personal life would be relevant during the second phase in determining whether

terminating her parental rights and appointing a guardian with authority to consent to adoption would be in the best interests of Davonte. The trial court should not have relied on evidence of her most recent departure from the conditions that caused her to be unfit during the relevant statutory time period. The time limitations in the statutes are not suggestions. Courts are not free to disregard them when they are determining a parent's fitness. The court should have looked at the 12-month period beginning immediately after the adjudication of neglect. Here, during that time the mother was clearly an addict and showed almost no interest in Davonte's care or welfare.

While we recognize that Tawanda has made progress in her life, this does not render her a fit parent. Rather, her conduct during the relevant statutory period was woefully inadequate. Under the facts of the instant case, we hold that the trial court's finding of fitness was against the manifest weight of the evidence, and we reverse the trial court's order.

Pursuant to our holding, the second phase of the bifurcated hearing must be held to determine whether termination of Tawanda's parental rights and appointment of a guardian with authority to consent to Davonte's adoption would be in Davonte's best interests. "A separate hearing and determination of the child's best interests is mandatory in order to ensure the proper focus on those interests." *A.P.*, 277 Ill. App. 3d at 600.

Accordingly, we reverse the juvenile court's order finding Tawanda not to be unfit and remand for a hearing to determine whether the termination of Tawanda's parental rights and appointment of a guardian with authority to consent to adoption would be in the best interests of Davonte.

Reversed and remanded.

CAMPBELL, P.J., and GREIMAN, J., concur.